**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MARC S. SILVER,

        *Plaintiff-Appellant,*

v.

EXECUTIVE CAR LEASING LONG-
TERM DISABILITY PLAN, an
employee welfare benefits plan
under ERISA,

        *Defendant-Appellee.*

No. 04-55747

D.C. No.
CV-02-05279-SVW

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the Central District of California
Stephen V. Wilson, District Judge, Presiding

Argued and Submitted
February 14, 2006—Pasadena, California

Filed August 7, 2006
Amended October 6, 2006

Before: Betty B. Fletcher, Warren J. Ferguson, and
Consuelo M. Callahan, Circuit Judges.

Opinion by Judge B. Fletcher

17345

**COUNSEL**

Lyle R. Mink, Esq., Los Angeles, California, for the plaintiff-appellant.

Stacey R. Turner, Esq., Los Angeles, California, for the defendant-appellee.

**ORDER**

The opinion filed August 7, 2006 at slip op. 8907 is amended as follows:

The final paragraph of the Standard of Review Section at slip op. 8918-19 is deleted and replaced by the following:

> We note that scrutiny is especially warranted when, after conducting de novo review of a decision by an ERISA plan administrator, a district court adopts verbatim the administrator's proposed factual findings and legal conclusions. We have previously

emphasized that, when they conduct de novo review, district courts have a responsibility under the ERISA framework to undertake an independent and thorough inspection of an administrator's decision. *See Mongeluzo*, 46 F.3d at 943 (emphasizing the obligation of the district court to conduct a sufficiently thorough review of the record, as well as its authority to introduce additional evidence into the record, in order to "enable the full exercise of informed and independent judgment"). When a district court adopts wholesale and verbatim the findings and conclusions of an ERISA plan administrator, it behooves us to review the district court's findings carefully to ensure that the trial court has adequately discharged its responsibility. Wariness of a district court's verbatim adoption of a plan administrator's proposed findings is especially warranted in the ERISA context because of the complex and sometimes conflicting roles of plan administrators. *See Abatie v. Alta Health & Life Ins. Co.*, No. 03-55601, slip op. at 9630 (9th Cir. Aug. 15, 2006) (noting that a district court's review of an administrator's decision must be "tempered by skepticism commensurate with the plan administrator's conflict of interest"); *In re T.H. Richards Processing Co.*, 910 F.2d 639, 643 n.2 (9th Cir. 1990) (noting that courts must be wary of borrowed findings in any event); *Sealy, Inc. v. Easy Living, Inc.*, 743 F.2d 1378, 1385 n.3 (9th Cir. 1984) (same).

With that amendment we reinstate the mandate.

---

## OPINION

B. FLETCHER, Circuit Judge:

Marc Silver claims that he is disabled due to the deteriorating condition of his heart. He argues that, as a result of his

disabling heart condition, he is entitled to benefits under an insurance policy issued by the UNUM Life Insurance Company of America ("UNUM"). UNUM claims that Silver recovered from his disability and that under the terms of the policy he is therefore not entitled to benefits. Following a bench trial, the district court upheld UNUM's decision to deny Silver's claim. We now reverse.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

Since 1974, Executive Car Leasing has provided coverage for its employees under a long-term disability insurance policy ("Policy"). The Policy is administered by UNUM and governed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 *et seq.* It provides benefits to Executive Car Leasing employees who suffer a loss of earnings due to disability. To qualify as disabled under the Policy, a claimant must demonstrate that "because of injury or sickness . . . [he] cannot perform each of the material duties of his regular occupation." Also, because the Policy covers only long-term disabilities, it establishes a 90-day "elimination period," during which time no benefits are payable. Thus, to receive benefits under the UNUM Policy, a claimant must establish not only that he is disabled, but also that he is disabled continuously for 90 days following the initial date on which he claims disability. If the claimant fails to show that he is continuously disabled throughout this elimination period and does not return to work after those 90 days, coverage under the Policy terminates.

Silver, an Executive Car Leasing employee who was covered under the UNUM Policy, has a lengthy history of severe heart disease. He is a long-time smoker — medical records indicate that he smoked up to one and a half packs a day for as many as 30 years — and for nearly as long he has suffered from claudication, or cramping, in his legs, which is a symptom of peripheral heart disease. In 1980, he suffered a myocardial infarction (a heart attack). Doctors discovered that

three vessels in his heart were blocked, and he underwent triple-bypass surgery to circumvent the obstructions. In 1983, he suffered another heart attack when one of the grafts from his bypass surgery became completely obstructed. He returned to the hospital complaining of chest pain in 1989 and 1991, and when he returned yet again in 1992, cardiologists found multiple pathways obstructed and conducted another triple-bypass surgery. In November of 1998, doctors again found that several of Silver's blood vessels were partially or entirely occluded. This time, they performed angioplasty — a procedure in which a small balloon is first inserted into the obstructed blood vessel and then inflated to clear the obstruction.

Despite these medical problems, Silver continued to work as a sales manager at Executive Car Leasing. His job generally required him to work around nine hours a day and demanded that he fulfill sales quotas for the company. Silver claims that the work was stressful for him, and UNUM has conceded that his employment at Executive Car Leasing required him to work under stressful conditions.

The events giving rise to this lawsuit started to unfold when, in December of 2000, he once again started having chest pain. On December 14, 2000, Silver sought treatment at Western Medical Center in Santa Ana, California, after experiencing acute chest pain and angina, or shortness of breath. An initial examination excluded the possibility of another heart attack, but concluded that Silver would require a cardiac catheterization (his fifth such procedure) and possibly another angioplasty procedure. Further examination revealed that there were lesions in two of his blood vessels and that several other vessels were occluded, or blocked, with the openings in some of these vessels narrowed by as much as 95 percent. Doctors performed another angioplasty on Silver, his second. Medical reports from this hospitalization indicate that the procedure was successful and that the results from the angioplasty were excellent. Upon his release from the hospital,

Silver consulted his long-time cardiologist, Dr. Melvin Tonkon, who advised him to stop working. Silver followed Dr. Tonkon's advice, stopped working, and filed a claim for benefits under the UNUM Policy. He described his disability as "heart disease and angioplasty," and he listed his date of disability as December 14, 2000 — the date on which his second angioplasty procedure had been performed.

In the 90 days that followed his second angioplasty procedure — *i.e.*, during the critical "elimination period" that followed his purported "date of disability" — Silver continued to experience complications related to his cardiac condition. He visited a pulmonary specialist, Dr. Fox, whose records contain mixed news on Silver's condition — while Dr. Fox noted that there was only "mild obstruction" of some of Silver's blood vessels, he also reported that Silver complained of shortness of breath, that Silver was experiencing decreased blood flow on the left side of his body (which another doctor attributed to a partially occluded artery), and that Silver had symptoms consistent with chronic bronchitis and emphysema. Silver also visited a sleep specialist, who diagnosed Silver as having "obstructive sleep apnea," a condition related to high blood pressure and other cardiovascular disease that causes its sufferers to stop breathing repeatedly during their sleep, sometime hundreds of times during the night and often for a minute or longer. Again during the elimination period Silver returned to the emergency room after waking up with "sharp, stabbing" chest pain. The medical records from this visit contain mixed results. Some tests indicated an "abnormal resting electrocardiogram" and "changes of uncertain significance" in Silver's heart condition, including one diagnosis that suspected partial blockage of his "left subclavian" artery. With other tests, doctors noted that there had been improvement in the area where angioplasty had been performed, and they ultimately released Silver from the hospital without change in his medical condition. Throughout the elimination period, Silver worked with Dr. Tonkon on a program of cardiac rehabilitation; due to concerns about being able to drive safely to and

from the proper medical facilities, he pursued this rehabilitation program at home.

Following the end of the 90-day elimination period, Silver's cardiac woes continued. He returned to Western Medical Center on May 28, 2001, complaining of chest pain. Once again, doctors found his heart in poor condition, with his right coronary artery and his left anterior descending artery nearly completely blocked. Again, doctors performed an angioplasty procedure. This third angioplasty procedure was completed with "no complications," and Silver was again released. Thereafter, Silver successfully pursued a claim for disability benefits from the Social Security Administration (SSA). Though the SSA ultimately determined that Silver was entitled to benefits as a result of a psychological exam diagnosing him with affective mood disorder, the SSA also determined that Silver "became disabled under our rules on December 14, 2000," indicating that Silver's psychological problems were at least related to, if not triggered by, his cardiac condition and the angioplasty procedure that took place on that date.

UNUM ultimately rejected Silver's claim, ruling that Silver's cardiac condition had substantially improved following the angioplasty procedure and that he therefore had not demonstrated that he was continuously disabled during the 90-day elimination period, which expired on March 14, 2001. UNUM's letter stated: "After comprehensive review of the medical information in file, it is our medical department's opinion that your cardiac condition was resolved within the elimination period and no longer precludes you from performing the material and substantial duties of your occupation as a sales manager."[1] Letter from Patrick Taylor, Associate Cus-

---

[1]Silver argues that UNUM's letter denying benefits did not adequately explain the company's decision to reject his claim and thereby deprived him of the ability to challenge that decision effectively. We are satisfied that the denial letter met the requirements set forth in the applicable federal regulations. *See* 29 C.F.R. § 2560.503-1(g). The letter explained why

tomer Care Specialist, UNUM Life Insurance Company, to Marc S. Silver, at 1 (May 4, 2001) (hereinafter "UNUM Letter"). UNUM based its ruling on the conclusions of its in-house medical personnel that Silver's cardiac condition had stabilized and that "[t]here is no documented indication of continued chest pain." *Id.* at 2. Silver pursued an administrative appeal, which UNUM denied.

Silver then filed this lawsuit to contest UNUM's decision. The district court found that *de novo* review of UNUM's ruling was appropriate because the ERISA plan adopted by Executive Car Leasing did not give UNUM discretionary authority to make benefit determinations and to interpret the plan. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999); *see also Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1090 & n.2 (9th Cir. 1999) (en banc) (holding that a policy with similar terms rendered the insurance company's decision subject to *de novo* review). The district court conducted this *de novo* review of the UNUM decision with a bench trial.[2] Following the bench trial, the district court

(Text continued on page 17356)

---

Silver's claim was denied and pointed to the specific provision in the Policy on which the decision was based, *i.e.* the clause relating to the elimination period. Further, UNUM advised Silver why UNUM considered the claim inadequate, including the basis for its judgment that a restriction on working was "medically unnecessary," and it informed Silver about how to obtain a review of UNUM's decision. We hold that UNUM's denial letter complied strictly with applicable federal regulations and that it satisfied the "common sense" requirement that plan administrators engage in "meaningful dialogue" with claimants about the reasons for denying their claims. *Booton v. Lockheed Med. Benefit Plan*, 110 F.3d 1461, 1463 (9th Cir. 1997).

[2]In general, a district court may consider only evidence within the administrative record at the time of the administrator's decision. *See Taft v. Equitable Life Assurance Soc'y*, 9 F.3d 1469, 1472 (9th Cir. 1993). This restriction is based on the principle that federal district courts should not function "as substitute plan administrators," and that expanding the record on appeal "would frustrate the goal of prompt resolution of claims by the

fiduciary under the ERISA scheme." *Id.* (quoting *Perry v. Simplicity Eng'g*, 900 F.2d 963, 967 (6th Cir. 1990)). Yet there is an exception to this general exclusionary rule where, as here, a federal court reviews an administrator's decision *de novo*. *See Mongeluzo v. Travenol Long Term Disability Benefit Plan*, 46 F.3d 938, 943-44 (9th Cir. 1995). The Ninth Circuit "permits the district court *in its discretion* to allow evidence that was not before the plan administrator," but we have advised that "[t]he district court should exercise its discretion . . . only when circumstances clearly establish that additional evidence is necessary to conduct an adequate *de novo* review of the benefit decision." *Id.* at 944 (quoting *Quesinberry*, 987 F.2d at 1025). *See also Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 944 & n.2 (9th Cir. 1999).

Here, Silver contests some of the evidentiary rulings made by the district court during the bench trial. We conclude that none of the items excluded by the district court were necessary to its *de novo* review. The first, a formal letter from the Social Security Administration describing its approval of Silver's application for benefits, merely repeats information that was already available to UNUM. The second, a report prepared by a "vocational expert," which describes the requirements of Silver's job and opines that his heart condition rendered him unable to perform them, contains new information only about undisputed facts (*e.g.*, the stressful nature of Silver's job) and otherwise merely reviews medical records already contained in the record. And the third, a letter written by Silver's attorney in response to UNUM's decision to deny Silver's administrative appeal, contains only argument disputing UNUM's decision — argument that Silver presented directly to the district court when it argued the case at trial. Because none of these items of evidence was necessary to the district court's *de novo* review, we hold that the court did not abuse its discretion by excluding them.

We further reject Silver's argument that the district court improperly admitted documents prepared by UNUM in the course of the administrative appeal. Silver contends that UNUM unfairly kept the record open for itself after closing the record to him, but there is no other way that UNUM could have addressed Silver's appeal except by waiting until he had submitted all of his material. Simply put, in order for UNUM to evaluate Silver's administrative appeal fairly, it *had* to wait until Silver had submitted all of his materials; for UNUM to do otherwise would either undermine Silver's ability to present all of his supporting information or lead to an interminable back-and-forth between the plan administrator and the claimant. Further, the paperwork generated by UNUM in the course of its

upheld UNUM's decision. In rendering its decision, the district court adopted wholesale and verbatim 25 pages of factual findings and legal conclusions that UNUM had proposed.

Like UNUM — or, more accurately, via UNUM's attorneys — the district court concluded that Silver had failed to meet the burden of proving his disability. The court found that, because Silver had failed to provide sufficient proof of his disability and had not returned to work after the elimination period, coverage under the Policy had terminated. Accordingly, the district court entered judgment in favor of UNUM.

Silver appealed the district court's decision. We have jurisdiction under 28 U.S.C. § 1291.

## II.   STANDARD OF REVIEW

Where, as here, a district court has conducted a *de novo* review of an ERISA plan administrator's decision, we review

---

review was fully disclosed to Silver during trial at the district court, at which point Silver had ample opportunity to respond.

Finally, we reject two other evidentiary objections raised by Silver. First, we conclude that the district court properly excluded a 46-page declaration submitted by Silver's attorney; that declaration, which was submitted in response to the court's request for post-trial briefing, contains legal argument that was not appropriate for a declaration, as well as analysis of complex medical procedures as to which Silver's attorney would not have been competent to testify. *See* Fed. R. Civ. P. 56(e) (providing that declarations "shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein"). The district court also properly rejected Silver's request for judicial notice. The sixteen exhibits attached to that request included more than 250 pages of medical materials from sources as diverse as Yahoo!Health and the website for the Japanese Circulation Society; we agree that these items were not sufficiently reliable to be judicially noticeable, and that Silver has not demonstrated that their exclusion was prejudicial to him. *See* FED. R. EVID. 201(b) (requiring requests for judicial notice to set forth facts that are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned").

the court's factual findings only to determine whether they are "clearly erroneous." *Kearney*, 175 F.3d at 1095. Even when a district court adopts wholesale the findings of fact proposed by one party, as the district court did here, we do not alter this standard of review. *See Anderson v. City of Bessemer*, 470 U.S. 564, 572 (1985) ("[E]ven when the trial judge adopts proposed findings of fact verbatim, the findings are those of the court and may be reversed only if clearly erroneous."); *Barnett v. Sea Land Serv., Inc.*, 875 F.2d 741, 745 (9th Cir. 1989) ("We refuse to apply a stricter standard of review based on the fact that the district court may have adopted certain findings proposed by either party." (citing *Bessemer*, 470 U.S. at 572)).

Nonetheless, the wholesale and verbatim adoption of one party's findings requires us to review the record and the district court's opinion more thoroughly. The Ninth Circuit has reiterated, both before and after the Supreme Court's decision in *Bessemer*, that it reviews a district court's findings of fact "with special scrutiny" when a district court "engage[s] in the regrettable practice of adopting the findings drafted by the prevailing party wholesale." *Sealy, Inc. v. Easy Living, Inc.*, 743 F.2d 1378, 1385 (9th Cir. 1984); *see also In re T.H. Richards Processing Co.*, 910 F.2d 639, 643 n.2 (9th Cir. 1990) (quoting *Sealy*, 743 F.2d at 1385). Thus, we review the district court's decision "with special scrutiny," *Sealy*, 743 F.2d at 1385, to determine whether its findings were "clearly erroneous," *Bessemer*, 470 U.S. at 572. While there is some dissonance between the deferential standard of review we now apply and our practice of scrutinizing the findings of a district court that uncritically adopts the proposed opinion of the victorious party, these two lines of authority are not incompatible; indeed it is entirely consistent to review a district court's conclusions for clear error, while applying that standard of review with a careful inspection of the record. *See Commodities Futures Trading Comm'n v. Topworth Int'l, Ltd.*, 205 F.3d 1107, 1112 (9th Cir. 1999) (noting that factual findings are "reviewed for clear error, but with particularly close scru-

tiny [where] the district court adopt[s] [one party's] proposed findings").

**[1]** We note that scrutiny is especially warranted when, after conducting de novo review of a decision by an ERISA plan administrator, a district court adopts verbatim the administrator's proposed factual findings and legal conclusions. We have previously emphasized that, when they conduct de novo review, district courts have a responsibility under the ERISA framework to undertake an independent and thorough inspection of an administrator's decision. *See Mongeluzo*, 46 F.3d at 943 (emphasizing the obligation of the district court to conduct a sufficiently thorough review of the record, as well as its authority to introduce additional evidence into the record, in order to "enable the full exercise of informed and independent judgment"). When a district court adopts wholesale and verbatim the findings and conclusions of an ERISA plan administrator, it behooves us to review the district court's findings carefully to ensure that the trial court has adequately discharged its responsibility. Wariness of a district court's verbatim adoption of a plan administrator's proposed findings is especially warranted in the ERISA context because of the complex and sometimes conflicting roles of plan administrators. *See Abatie v. Alta Health & Life Ins. Co.*, No. 03-55601, slip op. at 9630 (9th Cir. Aug. 15, 2006) (noting that a district court's review of an administrator's decision must be "tempered by skepticism commensurate with the plan administrator's conflict of interest"); *In re T.H. Richards Processing Co.*, 910 F.2d 639, 643 n.2 (9th Cir. 1990) (noting that courts must be wary of borrowed findings in any event); *Sealy, Inc. v. Easy Living, Inc.*, 743 F.2d 1378, 1385 n.3 (9th Cir. 1984) (same).

## III.  Discussion

Both UNUM and the district court found that Silver was not entitled to benefits under the Policy because he had recov-

ered from his disability within the 90-day elimination period. We hold that this finding is clearly erroneous.

[2] There can be no dispute that Silver was disabled within the meaning of the Policy's terms when, on December 14, 2000, he went to the emergency room to seek treatment for his cardiac condition. The sole question is whether, during the following three months, Silver was able to perform the material functions of an admittedly stressful job, or whether his cardiac condition prevented his return to work during those 90 days.

[3] The district court upheld UNUM's determination "that [Silver] was not disabled as of March 14, 2001, the conclusion of the elimination period." Much of its reasoning, however, does not withstand scrutiny. For example, the district court reasoned in part that Silver was not impaired during the elimination period because he "had worked for approximately 20 years with coronary artery disease, and continued to work following bypass surgeries and prior angioplasty procedures." Such a finding disregards the progressive and degenerative nature of Silver's cardiovascular disease, and it overlooks the recommendations of Silver's treating cardiologist, who had advised Silver only in recent visits that he was in no shape to be working. Likewise, the findings proposed by UNUM and adopted by the district court focus myopically on the test results indicating improvement in cardiovascular function following Silver's angioplasty procedure. While the post-angioplasty tests do indeed indicate some improvement in Silver's condition as to the affected areas of Silver's heart, they fall short of demonstrating Silver's ability to return to a stressful work environment, especially given the contemporaneous evidence of ongoing cardiac difficulty. In the same fashion, UNUM's in-house specialists and the district court's opinion repeatedly refer to Silver's rehabilitation routine as evidence of his recovery; these specialists argued that Silver was not disabled because he had been able to complete an exercise routine three to four times per week, while ignoring state-

ments establishing that he was still having trouble walking distances and sometimes could not clean his own house or bathroom. In short, the district court's factual findings and legal conclusions do not reflect a complete examination of the record and disregard significant evidence recommending the seriousness of Silver's impairment.

**[4]** Contrary to UNUM's position, Silver presented ample evidence that his cardiac problems did not dissipate following his second angioplasty procedure. As noted above, during the elimination period he visited a pulmonary specialist and a sleep specialist, and he returned to the hospital after experiencing chest pain. Test results from these medical consultations produced myriad indications that his heart was still seriously diseased, ranging from a diagnosis of sleep apnea to high blood pressure (for which he received additional medication) to an abnormal electrocardiogram to symptoms of bronchitis and emphysema. Silver's cardiologist specifically wrote to UNUM to indicate the seriousness of Silver's status: "My read on a patient that has suffered two myocardial infarctions [sic], has undergone two bypass surgeries, and several angioplasties, with multiple recurrent admissions for acute coronary syndromes, is not a patient who should be working under any conditions." Letter from Dr. Melvin J. Tonkon to Patrick Taylor, Associate Customer Care Specialist, UNUM Insurance Company, at 1 (March 30, 2001). This letter further reviewed Silver's longstanding and continuing symptoms of angina (shortness of breath) and a handicapping "inability to walk" due to claudication (cramping), and it recounted several episodes within days of the elimination period's expiration when Silver had taken nitroglycerin while experiencing "periods of stress." *Id.* Notwithstanding these offers of proof of disability, UNUM's medical staff concluded that Dr. Tonkon had failed to provide "objective evidence to support impairment." In our view, the evidence regarding Silver's status during the elimination period presents a far more compelling case for ongoing impairment than either UNUM or the district court recognized.

**[5]** Moreover, and most importantly, there is additional evidence that Silver's disability continued long after his hospitalization in December of 2000. Indeed, this would be a very different case, and we would be hard-pressed to make a finding of clear error, if Silver had continued to live without serious incident after his second angioplasty procedure. If that were the case, the record would contain only the competing evaluations of Silver's cardiologists and consultants and UNUM's in-house medical staff. Thus, despite its lopsided evaluation of the record regarding Silver's condition during the elimination period, the district court's decision would stand under those circumstances, for the record would provide "two permissible views of the evidence." *United States v. Working*, 224 F.3d 1093, 1102 (9th Cir. 2000) (en banc). But that is not what happened here.

**[6]** What leaves us with the "definite and firm impression that a mistake has been committed," *Easley v. Cromartie*, 532 U.S. 234, 242 (2001), is the fact that Silver returned to the emergency room in May of 2001, only weeks after the elimination period, and required yet another angioplasty procedure because two of his arteries were nearly completely blocked. This evidence of continuing heart problems, which again required hospitalization and invasive medical procedures, convinces us that UNUM and the district court clearly erred in ruling that Silver had "recovered" from his cardiac condition. The district court's opinion discounts Silver's subsequent return to the operating room, arguing that his cardiac complications in May of 2001 "did not present evidence [of] a deterioration in his condition during the elimination period." In other words, the court's position, as articulated by UNUM, is that Silver would have been entitled to benefits if he had undergone angioplasty several weeks earlier, but that this third angioplasty procedure did not provide sufficiently convincing evidence that Silver was actually suffering from any disability during the elimination period.

**[7]** We think it incredible that a man in Silver's physical condition, though completely disabled due to cardiac condi-

tions in December and the following May, could have had his "cardiac condition . . . resolved within the elimination period." This view stubbornly refuses to recognize that Silver's acute symptoms in December of 2000 and May of 2001 were in fact part and parcel of an ongoing cardiac condition. While there may have been no acute episode during elimination, the subsequent record clearly demonstrating continuing disability due to precisely the same degenerative cardiac disease makes UNUM's position untenable. In light of his rehospitalization in May, we conclude that the only proper interpretation of the evidence is that Silver suffered from an illness that prevented him from working under stressful conditions during the three months after his second angioplasty in December of 2000. We do not view the Policy as requiring Silver to have needed angioplasty on each of the ninety days during his elimination period; rather, we construe it as requiring Silver to demonstrate, consistent with its plain language, that he could not perform the material tasks of his job during this 90-day period because of his serious heart condition — a condition that UNUM itself acknowledges had been disabling. We are satisfied that Silver had met his burden.

[8] To use a metaphor, UNUM's position throughout this litigation has been that a vehicle would be suitable to drive in the months after its faulty transmission had been replaced, notwithstanding serious and credible signs pointing to the fact that the steering wheel was defective and the brakes were about to fail. Simply put, UNUM never came to terms with the argument advanced by Silver and his cardiologist that his disability extended beyond merely the vehicle's transmission problem — that is, beyond his second angioplasty and to a host of ongoing cardiovascular difficulties. *See Booton*, 110 F.3d at 1463 (noting the disincentive of an ERISA administrator to "come to grips" with a more comprehensive view, albeit a more sensible one, of a claimant's physical condition). Because the evidence, viewed in its entirety, supports no conclusion except that Silver was incapable of returning to work

between December 15, 2000, and March 14, 2001, we must reverse the judgment of the district court.

## IV. CONCLUSION

We find that Silver met his burden of proving his disability under the terms of the Policy issued by UNUM, and we hold that the district court's contrary conclusion was clearly erroneous. Accordingly, we **REVERSE** and **REMAND** for the district court to calculate an award of benefits consistent with this opinion.