Joseph DeBENEDICTIS, Plaintiff,

v.

HARTFORD LIFE AND ACCIDENT INSURANCE CO., et al., Defendants.

No. 2:07–cv–2561–HRH.

United States District Court, D. Arizona.

March 15, 2010.

Lisa Jeanette Counters, Counters & Koelbel PC, Kevin Koelbel, Law Offices of Kevin Koelbel PC, Chandler, AZ, for Plaintiff.

Brenden James Griffin, Kristina Novotny Holmstrom, Lewis & Roca LLP, Tucson, AZ, Ann–Martha Andrews, Lewis & Roca LLP, Phoenix, AZ, for Defendants.

## ORDER

H. RUSSEL HOLLAND, District Judge.

*Cross–Motions for Summary Judgment*

Plaintiff moves for summary judgment.[1] This motion is opposed,[2] and defendant cross-moves for summary judgment.[3] Defendant's cross-motion is opposed.[4] Oral argument was not requested and is not deemed necessary.

*Background*

Plaintiff is Joseph DeBenedictis. Defendant is Hartford Life and Accident Insurance Company.

Plaintiff began working for U.S. Bank on February 1, 2001 and became eligible for coverage under the U.S. Bancorp Long Term Disability Plan on March 1, 2001. U.S. Bank's LTD plan was initially self-funded, with defendant acting as the claims administrator. The Plan Administrator was U.S. Bancorp. As of January 1, 2005, the Plan became funded by a Hartford insurance policy. US Bancorp remained the Plan Administrator and defendant remained the claims administrator.[5] Under the self-funded Plan, the Benefits Committee had "the sole discretion, authority and responsibility to interpret and construe" the Plan.[6] In the Hartford-fund-

---

1. Docket No. 37.

2. Docket No. 43.

3. Docket No. 44.

4. Docket No. 48.

5. SEALED Admin. Rec. at DEBENpolicy00030, Docket No. 33.

6. SEALED Admin. Rec at DEBENclm00678, Docket No. 31.

ed Plan, the Plan granted defendant "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy."[7]

The self-funded Plan defined "Totally Disabled" as follows:

A Covered Employee is or continues to be Totally Disabled if the Claims Administrator determines that, as a result of accidental bodily injury or illness, the Covered Employee:

(a) is under the regular care and attendance of a qualified Physician;

(b) is following a recommended course of treatment for the disabling condition;

(c) is unable:

(i) during the Elimination Period and for the next twenty-four (24) months after the end of the Elimination Period to perform the essential functions of the Covered Employee's regular occupation, with reasonable accommodations; or

(ii) after the period in (i), to perform the essential functions of any occupation for which the Covered employee is qualified or may reasonably become qualified by education, training or experience; and

(d) has complied and continues to comply timely and satisfactorily with all requests of the Claim Administrator for proof of eligibility for benefits in this Plan, including without limita-

tion, proof of the receipt of or application for other income benefits and proof of examination by a Physician and, if requested, by an independent medical examiner.[[8]]

The Hartford-funded Plan defines "disabled" after the initial 24–month period as being "prevented from performing one or more of the Essential Duties of Any Occupation."[9] An essential duty

means a duty that:

1. is substantial, not incidental;

2. is fundamental or inherent to the occupation; and

3. can not be reasonably omitted or changed.[[10]]

Any Occupation means an occupation for which you are qualified by education, training or experience, and that has an earnings potential greater than an amount equal to the lesser of your Indexed Pre-disability Earnings and the Benefit Percentage for which you enrolled and the Maximum Monthly Benefit shown in the Schedule of Insurance.[[11]]

The Hartford-funded Plan provides that defendant may require that a claimant "be examined by a doctor, vocational expert, functional expert, or other medical or vocational professional of our choice."[12] If the claimant refuses without a valid reason, defendant "may deny, suspend or terminate . . . benefits[.]"[13] The Hartford-

---

**7.** SEALED Admin. Rec. at DEBENpolicy00030, Docket No. 33.

**8.** SEALED Admin. Rec at DEBENclm00662, Docket No. 31; *see also* SEALED Admin. Rec. at DEBENpolicy00019, Docket No. 33.

**9.** SEALED Admin. Rec. at DEBENpolicy00019, Docket No. 33.

**10.** SEALED Admin. Rec. at DEBENpolicy00019, Docket No. 33.

**11.** SEALED Admin. Rec. at DEBENpolicy00019, Docket No. 33.

**12.** SEALED Admin. Rec. at DEBENpolicy00016, Docket No. 33.

**13.** SEALED Admin. Rec. at DEBENpolicy00016, Docket No. 33.

funded Plan defines regular care of a physician as being

attended by a Physician, who is not related to you:

1. with medical training and clinical experience suitable to treat your disabling condition; and

2. whose treatment is:

a) consistent with the diagnosis of the disabling condition;

b) according to guidelines established by medical, research and rehabilitative organizations; and

c) administered as often as needed,

to achieve the maximum medical improvement.[ [14]]

The Hartford-funded plan requires a claimant to apply for Social Security benefits and to appeal through the hearing stage.[15] The plan permits defendant to deduct disability benefits received by a claimant or his family under the Social Security Act.[16] The plan further provides that defendant has the right to recover any overpayments it may have made when retroactive Social Security benefits are awarded.[17]

Finally, the plan provides that benefits can be terminated if the Claims Administrator determines that the claimant is no longer disabled, if the claimant is no longer under the care of a physician, if the claim-ant "fails to provide requested information on a timely basis"; or if the claimant "withholds or misrepresents the facts and circumstances surrounding his or her disability or claim for disability[.]" [18]

Plaintiff submitted a claim for LTD benefits on April 28, 2003.[19] Plaintiff's claim was based on back pain, which he began experiencing after a car accident in 1999. Plaintiff had two back surgeries, one in June 2000 and one in December 2001. At the time plaintiff first submitted his claim for LTD benefits, Dr. Goldberg, plaintiff's treating physician, opined that plaintiff could not lift more than ten pounds, could not sit more than one hour, could not stand more than one hour (or as tolerated) and that he could not do any lumbar bending or twisting.[20] Dr. Goldberg further opined that plaintiff's disability was "temporary." [21]

Defendant first approved plaintiff's claim for LTD benefits on May 9, 2003.[22] On August 8, 2003, Dr. Goldberg advised that plaintiff's condition had improved but that he still had significant residual symptoms.[23]

On August 18, 2003, defendant advised plaintiff to apply for Social Security benefits.[24] Defendant told plaintiff that "[b]enefits received from Social Security are an offset under the terms of your plan. . . . If

---

14. SEALED Admin. Rec. at DEBENpolicy00022, Docket No. 33.

15. SEALED Admin. Rec. at DEBENpolicy00016, Docket No. 33.

16. SEALED Admin. Rec. at DEBENpolicy00021, Docket No. 33.

17. SEALED Admin. Rec. at DEBENpolicy00017, Docket No. 33.

18. SEALED Admin. Rec. at DEBENclm00669, Docket No. 31.

19. SEALED Admin. Rec. at DEBENclm00389, Docket No. 31.

20. SEALED Admin. Rec. at DEBENclm00398, Docket No. 31.

21. SEALED Admin. Rec. at DEBENclm00394, Docket No. 31.

22. SEALED Admin. Rec. at DEBENclm01296, Docket No. 32.

23. SEALED Admin. Rec. at DEBENclm00332, Docket No. 31.

24. SEALED Admin. Rec. at DEBENclm00330, Docket No. 31.

you receive a retroactive award, your claim will be overpaid. You will be expected to make full payment on any retroactive payment." [25] On August 22, 2003, plaintiff applied for Social Security benefits. [26] On that same day, plaintiff signed a LTD Payment Options and Reimbursement Agreement. Plaintiff requested that defendant "[p]lease pay me my monthly Long Term Disability benefit with no reduction for estimated Other Income Benefits. I understand that this may result in an overpayment of my LTD benefits which I will be required to refund to the Benefit Plan in a lump sum." [27]

In December 2003, plaintiff's application for Social Security benefits was initially denied. [28] Also in December 2003, plaintiff's treating physician, Dr. Sami Chaudhuri, opined that plaintiff could stand for 30 minutes, walk for 15 minutes, and sit for 15–30 minutes; that he could not lift/carry; that he could do no reaching/working overhead; that he could push/pull up to 10 pounds; that driving was okay when he was alert; and that he could repetitively use his hands for 45 minutes to one hour. [29]

In March 2004, plaintiff filed an appeal of the initial denial of his application for Social Security benefits. [30] In July 2004, Dr. Chaudhuri opined that plaintiff's condition had retrogressed. [31]

In September 2004, defendant advised plaintiff that it would begin the "test change" investigation to determine if he was disabled from any occupation. [32] Beginning in February 2005, plaintiff would be eligible for LTD benefits only if he was met the "any occupation" definition of disability in the plan.

On October 21, 2004, plaintiff was awarded Social Security benefits. The ALJ found that plaintiff had severe back pain secondary to lumbar disc disease and severe depression. [33] The ALJ concluded that plaintiff's physical and psychological impairments "preclude[d] the performance of a significant range of even sedentary level work on a sustained basis; [plaintiff']s limitations at even the 'less than sedentary' level are of such severity that they erode the unskilled sedentary occupational base significantly[.]" [34]

In October 2004, plaintiff consulted with Dr. Anthony DiGianfilippo, a neurologist, whose impression was "basically chronic pain syndrome although [plaintiff] does have other signs and symptoms which would even make me concerned about carpal tunnel syndrome in the upper extremities. He also may have myofascial type symptoms. Much of what he describes sounds muscular." [35]

25. SEALED Admin. Rec. at DE-BENclm00330, Docket No. 31.

26. SEALED Admin. Rec. at DE-BENclm00012, Docket No. 31.

27. SEALED Admin. Rec. at DE-BENclm00328, Docket No. 31.

28. SEALED Admin. Rec. at DE-BENclm00014, Docket No. 31.

29. SEALED Admin. Rec. at DE-BENclm01618, Docket No. 33.

30. SEALED Admin. Rec. at DE-BENclm00776–82, Docket No. 32.

31. SEALED Admin. Rec. at DE-BENclm01615, 01618, Docket No. 33.

32. SEALED Admin. Rec. at DE-BENclm00027, Docket No. 31.

33. SEALED Admin. Rec. at DE-BENclm01312, Docket No. 32.

34. SEALED Admin. Rec. at DE-BENclm01312, Docket No. 32.

35. SEALED Admin. Rec. at DE-BENclm01555, Docket No. 33.

In November 2004, the Hartford claims examiner noted that "[r]eview of claim files shows that [plaintiff's] condition appears to be deteriorating."[36] Also in November 2004, plaintiff was examined by Dr. Christopher Siodlarz, a physical medicine and rehabilitation specialist. Dr. Siodlarz's impressions were "severe post fusion pain with left lumbosacral radiculitis with leg pain[,]" "[r]ight cervical stenosis with radiculitis[,]" and "[c]hronic pain."[37]

On December 18, 2004, defendant wrote to plaintiff about the overpayment of LTD benefits because of his award of Social Security benefits. Defendant estimated that plaintiff had been overpaid $37,700.93.[38]

In January 2005, plaintiff relocated to Arizona. He told defendant that he planned to begin treating at the Mayo Clinic but could not do so until March 2005 because of insurance coverage issues. There is no evidence that plaintiff ever treated at the Mayo Clinic in Arizona. Plaintiff also told defendant that recent testing showed that he had a lot of scar tissue on his nerves and nerve damage, and that "everyone wants to do more surgery[.]"[39] None of his records, however, show significant scar tissue or nerve damage, and both Drs. Goldberg and DiGianfillipo recommended against additional surgery.

On January 30, 2005, defendant determined that plaintiff was disabled under the "any occupation" provision and approved his claim for continuing LTD benefits.[40] Defendant did so, in part, to allow plaintiff time to establish medical care in Arizona.[41]

In April 2005, defendant called and left several messages for plaintiff seeking information about his treatment and to discuss the overpayment of LTD benefits due to plaintiff's being awarded social security benefits in September 2004. On April 19, 2005, plaintiff's "[c]laim [was] proactively reviewed by SIU [the Special Investigations Unit] but was not accepted for investigation at th[at] time."[42] On April 22, 2005, plaintiff contacted defendant and reported that he had not received the messages that defendant had left.

On April 27, 2005, plaintiff's claim was again referred to SIU and this time it was "accepted for investigation."[43] The SIU claim log makes references to the amount of reserve in plaintiff's claim. As of October 2005, the net reserve was $143,615.00.[44] In the "outcome" section of the SIU log, the final net reserve is listed as $97,985. 00.[45]

As part of the investigation, 20 hours of surveillance was requested. Video surveillance of plaintiff was done on May 20 and 21, 2005. For May 20, the "[t]otal subject VIDEO is approximately eight minutes thirty-five seconds."[46] It is noted that the

---

36. SEALED Admin. Rec. at DE-BENclm00032, Docket No. 31.

37. SEALED Admin. Rec. at DE-BENclm01533, Docket No. 33.

38. SEALED Admin. Rec. at DE-BENclm01543, Docket No. 33.

39. SEALED Admin. Rec. at DE-BENclm00039, Docket No. 31.

40. SEALED Admin. Rec. at DE-BENclm00040, Docket No. 31.

41. SEALED Admin. Rec. at DE-BENclm00040, Docket No. 31.

42. SEALED Admin. Rec. at DE-BENclm00044, Docket No. 31.

43. SEALED Admin. Rec. at DE-BENclm00046, Docket No. 31.

44. SEALED Admin. Rec. at DEBENprel-it00108, Docket No. 33.

45. SEALED Admin. Rec. at DEBENprel-it00110, Docket No. 33.

46. SEALED Admin. Rec. at DEBENprel-it00040, Docket No. 33.

"VIDEO depicts the subject walking, carrying items, pushing shopping cart, driving, and bending at the waist. The subject appeared to ambulate in a normal manner, without restrictions or the use of visible medical devices."[47] For May 21, the "[t]otal subject VIDEO is approximately seven minutes twenty-six seconds."[48] It is noted that the "VIDEO depicts the subject walking, pushing a shopping cart, driving, carrying items (including a case of water and other large items) and bending at the waist. The subject appeared to ambulate in a normal matter, without restrictions or the use of visible medical devices."[49]

An additional 20 hours of surveillance was requested because plaintiff "was observed performing activities outside of his stated limitations."[50] Surveillance was done on June 16 and 17, 2005, but no activity was observed.[51] Additional surveillance was conducted on July 20 and 21, 2005.[52] No activity was observed on July 20.[53] On July 21,

VIDEO depicts the subject as he exited the vehicle and entered a local convenience store. VIDEO depicts the subject as he exited the store carrying a large beverage, entered the vehicle and departed the area. We lost visual contact of the subject's vehicle.... We terminated surveillance during the mid-afternoon hours, due to the unknown location of the subject.[54]

On June 17, 2005, plaintiff consulted with Dr. James Maxwell. Plaintiff's chief complaint was "[r]ight lower extremity pain."[55] Dr. Maxwell's impression was "status post two level spinal fusion."[56] Dr. Maxwell stated that he "would not recommend further operative intervention."[57]

On August 8, 2005, the Hartford claims examiner, after reviewing the most recent surveillance video and report, stated that

[t]he subject has been observed performing activities outside of [his] stated limitations during the course of surveillance. Specifically, he has been observed sitting, standing, and walking beyond his stated limitations. I feel that at this time, an in-person interview is warranted.[58]

Stephen Murray, Hartford's in-house investigator, conducted the interview on September 14, 2005. Murray first asked plaintiff to describe his condition and limitations. Plaintiff stated that he had chronic fatigue and constant pain and that

he was capable of walking for about three blocks, shopping for 15 minutes at the most, standing for 15 to 20 minutes, and lifting and carrying 20 pounds about 20 feet. He said that he could bend at

47. SEALED Admin. Rec. at DEBENprelit00040, Docket No. 33.

48. SEALED Admin. Rec. at DEBENprelit00040, Docket No. 33.

49. SEALED Admin. Rec. at DEBENprelit00040, Docket No. 33.

50. SEALED Admin. Rec. at DEBENprelit00064, Docket No. 33.

51. SEALED Admin. Rec. at DEBENprelit00065, Docket No. 33.

52. SEALED Admin. Rec. at DEBENprelit00065, Docket No. 33.

53. SEALED Admin. Rec. at DEBENprelit00065, Docket No. 33.

54. SEALED Admin. Rec. at DEBENprelit00011, Docket No. 33.

55. SEALED Admin. Rec. at DEBENclm01493, Docket No. 33.

56. SEALED Admin. Rec. at DEBENclm01495, Docket No. 33.

57. SEALED Admin. Rec. at DEBENclm01495, Docket No. 33.

58. SEALED Admin. Rec. at DEBENprelit00066, Docket No. 33.

the waist to the level of his knees, twist at the waist 1/4 turn in each direction, and push a medium weight shopping cart about 15 minutes.... He reported that he had difficulty getting into his truck. He said that he had to pull on the roof[,] grab the handle and stand on the step bar to enter it. He said that he has difficulty sitting. He said he could sit for 15 to 20 minutes before he had to get up and move around due to right leg numbness and lower back pains.[59]

Murray then showed plaintiff the video surveillance. After seeing the video, plaintiff commented

> that he was capable of performing those activities documented on film, however, they did not represent his normal/average level of functionality on a daily basis. He said that he might go to Sam's Club every two or three weeks and spend that amount of time there depending on how he was feeling, whether or not his medication was working for him, and his ability to rest when he needed to while in the store. He said that he could not do it on a daily basis.[60]

In his summary of the interview, Murray noted that plaintiff "appeared to have physical discomfort while seated for longer than 15 minutes. He was able to complete the three hour long interview by standing and moving around when he needed to relieve his increased lower back and right leg discomfort." [61]

On September 27, 2005, plaintiff had a new patient consult at Southwest Spine & Sports. Drs. Kimberly K. Mongeau and Michael W. Wolff were involved in the consult. Drs. Mongeau and Wolff's impressions were:

1. Cervicalgia, most likely facetogenic in origin.
2. Bilateral CTS.
3. Obesity and deconditioning.
4. Mechanical low back pain.
5. Status post 2–level lumbar spinal fusion.
6. Peripheral neuropathy.
7. Insomnia secondary to pain.
8. Lumbar myofascial pain.[62]

On October 3, 2005, the Hartford claims examiner noted that

> [t]here appears to be some discrepancies in what [plaintiff] reports as his limitations and what he is observed doing on surveillance. Because of these inconsistencies, I am referring this claim to SIU MCM to review the medical documentation, surveillance material and interview statement to assist in determining if [plaintiff] is precluded from performing any occupation.[63]

On October 6, 2005, Judy Wilkins, a nurse, performed the SIU MCM assessment:

> It appears that [plaintiff] is not treating regularly with any physician in Arizona (where he moved to in 1/05) therefore it is not clear whether any physician is supporting [disability]. On 11/17/04, PM & R Siodlarz noted that a pain physician had recommended radiofrequency to [plaintiff] but that [plaintiff] did not feel that was necessary & did not want to go through that treatment. Diagnostic studies reflect a solid fusion at both

59. SEALED Admin. Rec. at DEBENprel-it00116, 118 Docket No. 33.

60. SEALED Admin. Rec. at DEBENprel-it00116–17, Docket No. 33.

61. SEALED Admin. Rec. at DEBENprel-it00126, Docket No. 33.

62. SEALED Admin. Rec. at DEBENclm01440, Docket No. 32.

63. SEALED Admin. Rec. at DEBENclm00052, Docket No. 32.

levels since 5/03 & no acute radiculopathy, yet [plaintiff] reports severe [symptoms]. The following limitations described during the interview conflict w[ith] the SIU findings; [plaintiff] describes slower than [normal] pace w[ith] occasional limp & favoring [right lower extremity], grocery shop 15 [minutes] max leaning on grocery cart, difficulty w[ith] hands, some difficulty getting into & out of car (needs to han[g] onto grab handle & step up into truck).

. . .

It is not clear whether Dr. Wolf[f] has resumed [plaintiff's] care. [Plaintiff] does have some clinical findings noted in the records provided yet is observed performing duties consistent w[ith] LIGHT work without any difficulty. Further, diagnostic studies fail to document etiology for [plaintiff's] severe complaints. Based on the available information, it would appear that [plaintiff] is not precluded from [full time] SEDENTARY & LIGHT work.[64]

Wilkins asked Dr. Wolff if he would provide a functional opinion. Dr. Wolff agreed to review the surveillance and provide a functional opinion.[65] Dr. Wolff indicated that he had "a few of [plaintiff's] medical records" and that he would "provide an opinion for a reasonable fee."[66]

On October 18, 2005, Wilkins sent Dr. Wolff a letter in which she stated that plaintiff "reports being limited from performing any gainful employment due to constant chronic fatigue throughout his body; constant pain in the low back and right lower extremity; numbness, heaviness, and tingling of the right lower extremity; left sided neck pain; and tingling & coldness in his hands."[67] Wilkins explained that plaintiff had been the subject of video surveillance and described the level of activity observed on the video.[68] Wilkins advised Dr. Wolff that it was defendant's opinion that plaintiff was capable of "performing full time SEDENTARY and LIGHT work" and provided a space for Dr. Wolff to sign if he agreed with this assessment.[69] Dr. Wolff signed the assessment on November 4, 2005.[70]

Dr. Wolff then phoned Wilkins on November 7, 2005. Wilkins noted that during the phone call, Dr. Wolff stated that "[a]bsolutely [plaintiff] can work!"[71] Dr. Wolff explain[ed] that he is very functionally minded & feels that there are very few people who are not capable of at least some level of work activity. He further explain[ed] that he is a physician who works everyday in chronic pain which probably makes him more acutely aware of his patient's abilities & limitations. He explain[ed] that he will be sending back my letter agreeing with our assessment on [plaintiff's] functionality & wanted to know if he should write something besides just providing his signature. I explained that his signature would suffice but offered that he could add something in the lines provided if he felt it was necessary.[72]

64. SEALED Admin. Rec. at DE-BENclm00053, Docket No. 31.

65. SEALED Admin. Rec. at DE-BENclm00055, Docket No. 31.

66. SEALED Admin. Rec. at DE-BENclm00055, Docket No. 31.

67. SEALED Admin. Rec. at DE-BENclm01432, Docket No. 32.

68. SEALED Admin. Rec. at DE-BENclm01432, Docket No. 32.

69. SEALED Admin. Rec. at DE-BENclm01433, Docket No. 32.

70. SEALED Admin. Rec. at DE-BENclm01433, Docket No. 32.

71. SEALED Admin. Rec. at DE-BENclm00057, Docket No. 31.

72. SEALED Admin. Rec. at DE-BENclm00057, Docket No. 31.

After completing an Employability Analysis Review, defendant notified plaintiff that he no longer met "the Policy definition of Disability" and that LTD benefits would not be paid past November 15, 2005.[73] Defendant told plaintiff that the denial was "based on policy language and all documents contained in [his] file were viewed as a whole."[74] Defendant noted that there were discrepancies in observed activities and self-reported capabilities, quoted extensively from plaintiff's September 14, 2005 statement, and noted that Dr. Wolff had concluded that plaintiff could work.[75] Defendant advised plaintiff that he still owed "$18,011.04" because of the overpayment and that "[e]ven though your claim has been closed[,] you are expected to repay us for this overpayment."[76] Defendant advised plaintiff of his right to appeal the denial of benefits.[77]

Plaintiff filed an appeal. He raised three issues on appeal: 1) the surveillance showed "only a few minutes of time" in his life; 2) Dr. Wolff only saw him once for a few minutes and did not perform a thorough examination; and 3) the Social Security Administration had awarded benefits under its regulatory definition of disability.[78] Plaintiff submitted a declaration in support of his appeal, in which he averred that his back pain was worse than before and that the video surveillance was not a "fair depiction of his life."[79]

Upon review of plaintiff's appeal, defendant determined that "an IME with an occupational medicine specialist or physical medicine and rehabilitation physician would be the proper course of action."[80] Plaintiff challenged defendant's right to request an IME during the appeal stage.[81] Defendant conceded that plaintiff was "currently under no contractual obligation to attend the IME and therefore his decision to attend is at his [ ] discretion."[82] Plaintiff ultimately agreed to attend the IME, which was scheduled for October 24, 2006.

Prior to the IME, plaintiff saw Dr. Howard Ginsburg, an orthopedic surgeon. Dr. Ginsburg's impression was "back and bilateral leg pain, right greater than left, status post fusion L3–5 with broken hardware in pedicles or remnants at L5 bilaterally. Probable epidural fibrosis. Rule out stenosis."[83] On October 6, 2006, Dr. Ginsburg completed a Work Status Form, in which he opined that plaintiff should be placed on an off work status until further notice.[84]

On October 24, 2006, Dr. Peter Vasquez completed plaintiff's IME. After a thorough exam, review of plaintiff's medical records, and review of the surveillance video, Dr. Vasquez concluded that plaintiff

**73.** SEALED Admin. Rec. at DE-BENclm01387, Docket No. 32.

**74.** SEALED Admin. Rec. at DE-BENclm01389, Docket No. 32.

**75.** SEALED Admin. Rec. at DE-BENclm01390–94, Docket No. 32.

**76.** SEALED Admin. Rec. at DE-BENclm01394, Docket No. 32.

**77.** SEALED Admin. Rec. at DE-BENclm01394–95, Docket No. 32.

**78.** SEALED Admin. Rec. at DE-BENclm01196–01208, Docket No. 32.

**79.** SEALED Admin. Rec. at DE-BENclm01337, Docket No. 33.

**80.** SEALED Admin. Rec. at DE-BENclm00062, Docket No. 31.

**81.** SEALED Admin. Rec. at DEBENprel-it00005–06, Docket No. 33.

**82.** SEALED Admin. Rec. at DE-BENclm01160, Docket No. 33.

**83.** SEALED Admin. Rec. at DE-BENclm00766, Docket No. 32.

**84.** SEALED Admin. Rec. at DE-BENclm00769, Docket No. 32.

was "capable of sustaining full-time work in a sedentary, or light duty occupation."[85]

On December 7, 2006, defendant notified plaintiff that the decision to terminate his LTD benefits "was appropriate and therefore, the decision will stand."[86] The denial letter stated:

> Based on the ... IME and the other evidence on file to include the assessment of the nurse case manager and her review of the medical records, the surveillance, and the opinion of Dr. Wolff, the weight of the evidence supports [plaintiff's] capacity to work in a sedentary to light duty occupation, such as those identified during the vocational analysis. While it is true that nothing has substantially changed in [plaintiff's] condition since August of 2002, the decision to pay his claim was based in part on the belief that his report was accurate, which is inherently brought into question by the surveillance. Moreover, the file remains absent a physician who believes [plaintiff] is incapable of working in any capacity.[87]

Plaintiff commenced this action on December 18, 2007 in which he seeks a review of the decision to deny him continued LTD benefits. Defendant answered and asserts four counterclaims against plaintiff: 1) equitable relief under 29 U.S.C. § 1132(a)(3); 2) breach of contract; 3) money due and owing; and 4) declaratory relief. Defendant's counterclaims are based on its contention that plaintiff has been overpaid $18,011.04 in LTD benefits and is obligated to reimburse defendant the amount of overpayment.

The parties filed cross-motions for summary judgment. Plaintiff seeks to have the benefits decision reversed and defen-

dant seeks to have it affirmed. Defendant also seeks summary judgment on its counterclaim that plaintiff is obligated to repay the amount of LTD benefits he has been overpaid.

*Discussion*

█ The parties' arguments have been put before the court via motions for summary judgment. In an ERISA action, generally " 'a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply.' " *Nolan v. Heald College*, 551 F.3d 1148, 1154 (9th Cir.2009) (quoting *Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir.1999)). However, in abuse of discretion cases in which the court considers evidence outside the administrative record, the traditional rules of summary judgment do apply. *Id.* Here, although defendant has submitted evidence beyond the administrative record, the court declines to consider that evidence. Thus, the usual tests for summary judgment do not apply here.

█ When, as here, an ERISA plan "grants the plan administrator discretionary authority to construe the plan's terms ..., the appropriate standard of review is for abuse of discretion, with any conflict of interest on the part of the plan administrator included as a factor to be taken into account in deciding whether the discretion has been abused." *Sznewajs v. U.S. Bancorp Amended and Restated Supp. Benefits Plan*, 572 F.3d 727, 733 (9th Cir.2009). The Ninth Circuit refers to this standard of review as "the informed abuse of discretion standard." *Id.* "Under the abuse of

---

85. SEALED Admin. Rec. at DE-BENclm00733, Docket No. 31.

86. SEALED Admin. Rec. at DE-BENclm00716, Docket No. 31.

87. SEALED Admin. Rec. at DE-BENclm00718, Docket No. 31.

discretion standard, [the court] must determine whether the plan administrator exercised its discretion reasonably." *Id.* at 734. " 'A plan administrator's decision to deny benefits must be upheld under the abuse of discretion standard if it is based upon a reasonable interpretation of the plan's terms and if it was made in good faith.' " *Id.* (quoting *McDaniel v. Chevron Corp.*, 203 F.3d 1099, 1113 (9th Cir.2000)). " 'Indeed, an administrator's decision is not arbitrary unless it is not grounded on *any* reasonable basis.' " *Id.* at 734–35 (quoting *Hensley v. Nw. Permanente P.C. Retirement Plan & Trust*, 258 F.3d 986, 1001 (9th Cir.2001), *overruled on other grounds by Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955 (9th Cir.2006) (en banc) (internal quotation marks omitted)). Under the informed abuse of discretion standard, the court "must determine whether the plan administrator 'operat[ed] under a conflict of interest,' and, if so, [it] must weigh 'that conflict . . . as a factor in determining whether there is an abuse of discretion.' " *Id.* at 733 (quoting *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 128 S.Ct. 2343, 2348, 171 L.Ed.2d 299 (2008)). "This informed variation on the abuse of discretion standard requires [the court] to discount the amount of deference given to the administrator's decision to the extent that decision appears to have been influenced by any conflicts of interest." *Id.* The court must "temper the abuse of discretion standard with skepticism 'commensurate' with the conflict." *Nolan*, 551 F.3d at 1153 (quoting *Abatie*, 458 F.3d at 959). "The level of skepticism with which a court views a conflicted administrator's decision may be low if a structural conflict of interest is unaccompanied, for example, by any evidence of malice, of self-dealing, or of a parsimonious claims-granting history." *Abatie*, 458 F.3d at 968.

A court may weigh a conflict more heavily if, for example, the administrator provides inconsistent reasons for denial; fails adequately to investigate a claim or ask the plaintiff for necessary evidence; fails to credit a claimant's reliable evidence; or has repeatedly denied benefits to deserving participants by interpreting plan terms incorrectly or by making decisions against the weight of evidence in the record.

*Id.* at 968–69 (citations omitted).

■ The court's first task then is to determine what weight to give defendant's conflict of interest. Plaintiff argues that there is strong evidence of bias on the part of defendant and thus the court should view the benefits decision with significant skepticism. Plaintiff contends that defendant's bias is shown by the following: 1) an improper reliance on the surveillance, 2) the fact that there was no significant change in his condition between the time defendant was paying benefits and the time defendant decided to stop paying benefits, 3)failure to consider the SSA finding of disability, 4) failure to insulate the claims department from financial considerations, 5) improper reliance on Dr. Wolff's assessment, and 6) reliance on Dr. Vasquez' IME precluded a full and fair review and violated ERISA regulations.

Plaintiff contends that defendant's reliance on the surveillance evidence was improper for several reasons. First, plaintiff argues that the reasons given for the surveillance referral lacked support. The reasons given for the surveillance were that plaintiff "might be misrepresenting his disability due to the fact that he recently moved to another state and the examiner has difficulty contacting him. [Plaintiff] continues to use a cell phone and calls back after business hours." [88] Refer-

**88.** SEALED Admin. Rec. at DEBENprelit00114, Docket No. 33.

ence was also made to the fact that plaintiff "[h]as not repaid overpayment like he stated he would and now has an attorney regarding dependent offsets."[89] The record shows that in April 2005, plaintiff had moved to another state, was not communicating adequately, and had failed to establish regular care in Arizona. It was not unreasonable for defendant to undertake surveillance under these circumstances.

Plaintiff also argues that defendant's investigative tactics are inconsistent with a duty to act in the best interest of the plan beneficiaries. Plaintiff accuses defendant of having a pattern of coaxing claimants into providing inconsistent information. Here, as in other cases, defendant did the surveillance, then told plaintiff it needed to do an in-person interview, but never told plaintiff about the surveillance. The surveillance was not mentioned until plaintiff had told the investigator about his activity level and then the surveillance video was played, which according to plaintiff, invariably shows the claimant doing something that was omitted from the general description of a typical day. Plaintiff contends that defendant then concludes that the claimant has been duplicitous. Plaintiff contends that use of this "ambush" technique has been rejected by other courts, but the three cases cited by plaintiff do not support this contention. *See Sanders v. Hartford Life and Acc. Ins. Co.,* Case No. Civ. 04–5163, 2006 WL 827095 (W.D.Ark. March 28, 2006) (no discussion of Hartford's investigative technique); *Thivierge v. Hartford Life and Acc. Ins. Co.,* Case No. C 05–0163 CW, 2006 WL 823751 (N.D.Cal. March 28, 2006) (no discussion of Hartford's interview technique); *Frei v. Hartford Life Ins. Co.,* Case No. C–05–01191 EDL, 2006 WL 563051 (N.D.Cal. March 7, 2006) (not clear if the plaintiff was ever shown the surveillance). The court finds nothing about defendant's in-

terview technique that suggests that defendant's benefits decision should be viewed with skepticism. When, as here, a benefits claim is based largely on subjective complaints of pain, it is reasonable for the administrator to consider the claimant's credibility.

Plaintiff also argues that defendant over-relied on the surveillance. Over-reliance on surveillance can be evidence of bias. *See Montour v. Hartford Life & Acc. Ins. Co.,* 588 F.3d 623, 633 (9th Cir. 2009). Plaintiff insists that defendant is relying on a few hours of surveillance without considering the rest of the evidence. Plaintiff contends that every doctor who supported the denial of benefits relied on the two days of surveillance in May 2005 but never mention the other 40 hours of surveillance that showed plaintiff engaged in limited or no activity. Plaintiff contends that the fact that he exceeded his limitations on the one day he went to Sam's Club cannot lead to discounting the rest of the evidence. Plaintiff also points out that the investigator did not observe him the entire time he was in the store, so defendant's contention that there was no evidence of him being in pain is unfounded.

Although the surveillance video was brief, there was a dramatic difference between what plaintiff said he could do and what was observed on the video. The video shows plaintiff literally hopping in and out of a very large (and therefore high off the ground), crew-cab pickup truck. The video shows plaintiff stooping to pick up parcels of unknown weight but of good size and then loading those parcels into the rather high bed of the pickup truck. The video also shows plaintiff walking with little to no difficulty. These are all activities that plaintiff claims he is incapable of performing at the levels observed. In this respect, the video surveillance here is dif-

---

89. SEALED Admin. Rec. at DEBENprel-    it00008, Docket No. 33.

ferent from that in *Montour*. There, the "observed activity was ... consistent with [the] Plaintiff's self-reported limitations." *Montour*, 588 F.3d at 633. But, here, the observed activity was inconsistent with plaintiff's self-reported limitations. Plaintiff claims that he was observed on a "good day," but given the dramatic difference between the limitations claimed and those observed, the court is unconvinced that the level of activity observed was a rare occurrence. Defendant's reliance on the surveillance was not improper or evidence of bias.

Plaintiff next argues that the fact that defendant had been paying him LTD benefits suggests that he was disabled and suggests that defendant's benefits decision may have been influenced by financial considerations. Plaintiff contends that in order to find that a disability no longer exists, the records should show an improvement, not just a lack of worsening of his condition. Plaintiff argues that defendant cannot point to any records that show that his condition improved. Plaintiff makes much of the fact that defendant relied on the opinions of Drs. Goldberg and Chaudhuri to determine that he was disabled under the "any occupation" definition and argues that defendant then ignored these opinions when it decided to deny him benefits. Plaintiff points out that even in its denial letter, defendant conceded that his condition had not improved.[90]

This argument misses the mark because defendant had new information regarding plaintiff's functionality when it made its decision to deny benefits, including 1) the surveillance which showed plaintiff performing activities significantly inconsistent with his stated functions; 2) plaintiff's failure to establish care for over nine months after moving to Arizona; 3) normal physi-cal findings by Drs. Wolff and Vasquez, and 4) Dr. Vasquez' conclusion that plaintiff could work. Defendant did not suddenly dismiss the opinions of Drs. Chaudhuri and Goldberg. Rather, it had more current information that showed that plaintiff was not disabled. *See Ellis v. Liberty Life Assur. Co. of Boston*, 394 F.3d 262, 274 (5th Cir.2004) ("The district court committed legal error when it concluded that, once the fiduciary approves entitlement to LTD benefits, subsequent termination of those benefits would have to be supported by substantial evidence of a *change in the employee's condition*.").

■ Plaintiff next argues that defendant's bias was shown by the fact that it failed to consider the SSA disability finding. "While ERISA plan administrators are not bound by the SSA's determination, complete disregard for a contrary conclusion without so much as an explanation raises questions about whether an adverse benefits determination was 'the product of a principled and deliberative reasoning process.'" *Montour*, 588 F.3d at 635 (quoting *Glenn v. MetLife*, 461 F.3d 660, 674 (6th Cir.2006)). The only reference defendant made to the SSA disability finding in its decision denying benefits was to note that plaintiff had submitted a copy of his SSA records.[91] In *Montour*, the court observed that "Hartford's failure to explain why it reached a different conclusion than the SSA is yet another factor to consider in reviewing the administrator's decision for abuse of discretion, particularly where, as here, a plan administrator operating with a conflict of interest requires a claimant to apply and then benefits financially from the SSA's disability finding." *Montour*, 588 F.3d at 637.

**90.** SEALED Admin. Rec. at DE-BENclm00718, Docket No. 33.

**91.** *See* SEALED Admin. Rec. at DE-BENclm00718, Docket No. 31.

Defendant's failure to consider the SSA finding of disability is some evidence that defendant's conflict of interest may have influenced its benefits decision. However, the court would note that when defendant made its benefits decision it had evidence before it that was not before the SSA. The SSA disability determination was also based on a mental impairment, an impairment that had never been the basis for plaintiff's LTD claim.

■■ Plaintiff next argues that the court should view the benefits decision with a high degree of skepticism because defendant failed to insulate the claims department from financial considerations. A structural conflict of interest will "prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances[.]" *MetLife*, 128 S.Ct. at 2351. Here, plaintiff argues that defendant did not attempt to shield its claims administrators from financial considerations primarily because the case information given to the SIU showed the net reserves on plaintiff's claim. Plaintiff argues that it is reasonable to infer that the SIU knew that if plaintiff's LTD benefits were terminated, defendant stood to save a substantial sum of money.

The presence of reserve information in the SIU file is irrelevant because there is nothing in the record that suggests that the SIU makes claims decisions.[92] That said, there is other evidence in the record that suggests that defendant did not take all of the steps it could have to reduce potential bias. In *Montour*, the court found that the record established that

Hartford did not take steps to ensure a neutral review process in part because its "nurse case manager took an advocacy position in her letters to Montour's physicians soliciting their agreement with her disability opinion." *Montour*, 588 F.3d at 634. Here, Wilkins also took an advocacy position in her letter to Dr. Wolff.

In that letter, Wilkins explained that plaintiff had been the subject of video surveillance. She told Dr. Wolff that

> [d]uring the activities check, [plaintiff] demonstrated the ability to visit various retail venues; walk at a moderate pace; operate a motorized vehicle; grasp, lift and carry large grocery items; and bend at the waist. He illustrated full functional range of motion and use of his upper and lower extremities as well as throughout his spine. All documented activities were performed without apparent hesitation or difficulty and without use of assistive devices. However, [plaintiff's] presentation during the 3 [hour] interview significantly differed. For example, he appeared uncomfortable, ambulated with a slight limp, and in a non-fluid manner, and changed positions frequently.[93]

Wilkins also noted the following "discrepancies between [plaintiff's] reported symptoms or limitations, the documented medical restrictions or information on file, and/or the investigative findings[:]"[94]

> [1.] On 11/17, 04 pain physiatrist Dr. Siodlarz recommended radiofrequency ablation but despite his debilitating pain, [plaintiff] did not feel this treatment was necessary.

---

92. The court has not considered the affidavit offered by defendant in reaching this conclusion. The affidavit is beyond the administrative record and defendant never moved to submit extrinsic evidence.

93. SEALED Admin. Rec. at DE-BENclm01432, Docket No. 32.

94. SEALED Admin. Rec. at DE-BENclm01432, Docket No. 32.

[2.] Since 7/18/03, flexion/extension xrays have revealed solid fusion at L3–4 and L4–5 without motion. Nerve conduction studies of both lower extremities on 8/4/03 failed to document any signs of acute radiculopathy.

[3.] Whereas [plaintiff] reports debilitating symptoms limiting his ability to perform any work, he failed to establish any medical care after moving to Arizona in January 2005 until June 2005 when he saw Dr. Maxwell once and then you once on 9/27/05.

[4.] During the interview, [plaintiff] was asked to describe his maximum functionality on a best day. Contrary to surveillance findings, he described a slower than normal walking pace with occasional limp favoring his right lower extremity, having difficulty using hands, and some difficulty with getting into and out of his truck.[ 95]

Wilkins advised Dr. Wolff that it was Hartford's opinion that plaintiff was capable of "performing full time SEDENTARY and LIGHT work" and provided a space for Dr. Wolff to sign if he agreed with this assessment.[96] Wilkins expressly stated that defendant's position was that plaintiff was capable of working, and she was plainly encouraging Dr. Wolff to find likewise.

Had defendant's benefits decision been based primarily on Dr. Wolff's opinion, the court would have to view that decision with a high degree of skepticism. Dr. Wolff was fed selective information by Wilkins; he had only seen plaintiff once and he did not personally conduct plaintiff's examination; and his functional opinion may have been clouded by his own personal experience. As to Dr. Wolff's opinion, defendant appears to have stepped well outside the role of a neutral evaluator of plaintiff's medical situation and whether he was disabled for purposes of "any occupation."

But, defendant did not simply rely on Dr. Wolff's opinion to make its benefits decision nor did defendant decide to rely on a " 'pure paper' " review, such as was done in *Montour*. *See Montour*, 588 F.3d at 634. Instead, defendant requested and plaintiff eventually agreed to submit to an IME. Defendant's decision to obtain an independent medical examination ameliorates, to a large degree, any concern that financial considerations were influencing the benefits decision here.

The IME completed by Dr. Vasquez was thorough. Dr. Vasquez's general physical examination revealed that plaintiff's

[s]tation is stiff sitting and standing. He is sitting leaning to one side and forward[ ] in the chair. However, when sitting on the exam table, he leans way back to rest against the wall, with limited flexion of his hips. Gait is antalgic, slightly stopped and wide based. Standing posture reveals a loss of lumbar lordosis. Normal spontaneous use of extremities. Able to alight and descend from exam table slowly and with difficulty. Arises from chair slowly and stiffly, with verbalizations. He is unable to squat and recover, or heel and toe walk. All transitional activity and light to moderate pressure on his back causes significant verbalizations of pain, groaning, grunting, and withdrawal behaviors in no specific anatomic distribution.[ 97]

**95.** SEALED Admin. Rec. at DE-BENclm01432–33, Docket No. 32.

**96.** SEALED Admin. Rec. at DE-BENclm01433, Docket No. 32.

**97.** SEALED Admin. Rec. at DE-BENclm00707, Docket No. 31.

Dr. Vasquez' physical examination of plaintiff's back revealed:

Thoracic Spine: Flexion: 10°; Extension: 10°; Right lateral bending: 30°; Lumbar Spine: Flexion: 5°; Extension: 10°; Right lateral bending: 0°; Left lateral bending: 0°. A 7″ well-healed midline surgical scar is noted over the lumbar region. Generalized tenderness to palpation is noted over the thoracolumbar region, without specific anatomic distribution. Marked diffuse dorsal voluntary muscle guarding is noted. No warmth, erythema, or swelling is noted. No CVA Tenderness, no sciatic notch tenderness, negative Tinel's.[98]

Dr. Vasquez' physical examination of plaintiff's lower extremities revealed that plaintiff had normal strength and range of motion in his hips, ankles, and feet; that his range of motion in his knees was normal but that there was "inconsistent 'giving way' during resisted flexion of his knees bilaterally;" and that "[s]traight leg raise of both legs elicits low back pain at 40 degrees, without radiation."[99] Dr. Vasquez noted that plaintiff's "[m]ood [was] mildly dysphoric and untrustful[.]"[100]

Dr. Vasquez' assessment was as follows:

1) Chronic low back pain with paresthesia.... There are no specific physical findings and no evidence of neural impingement on MRI or CT myelogram. There is no evidence of epidural scar formation or nerve root traction from scar. The fusion is intact and no abnormal motion is noted on radiographic examinations. Diagnostic possibilities include from mechanical back pain, facetogenic back pain, myofascial pain, or some level of somatization disorder. He is not a candidate for further surgical intervention. There is no reason to believe another course of epidural steroid injections would be helpful. It is possible that his pain is primarily facetogenic. The current literature suggests that a diagnostic trial of facet blocks may be useful in determining the contribution of facet pathology to his overall pain. If the blocks are very helpful, even temporarily, then consideration could be given to radioablation rhyzotomy. If facet blocks are not helpful, there are no other interventions available. If this is the case, or if he is unwilling to consider diagnostic facet blocks, engagement of a multi-disciplinary pain management group may be helpful. However, [plaintiff] has seemed unwilling to utilize such offers, in that they rely on therapy and conditioning, activities which he believe[s] aggravate his condition.

The level of self-reported impairment differs substantially from that reported during surveillance on two consecutive days in May 2005. After viewing the video surveillance, [plaintiff] apparently responded that after a day like that he would be in bed the next day. However, this begs the issue that such level of activity was noted on two consecutive days. There is also some confusion in my mind as to how he is only able to sit for 10 minutes, but is able to drive for 45 minutes. The level of pain behavior (grimacing, groaning, pain with light to moderate touch, and non-anatomic distribution of pain) is inconsistent with the activity noted during surveillance. All this

---

**98.** SEALED Admin. Rec. at DE-BENclm00707, Docket No. 31.

**99.** SEALED Admin. Rec. at DE-BENclm00707, Docket No. 31.

**100.** SEALED Admin. Rec. at DE-BENclm00707, Docket No. 31.

suggests a level of self-reported symptom magnification.

2) Neck pain, possible facetogentic, without evidence of radiculitis on examinations or MRI. This does not seem to be a significantly limiting factor to working sedentary [or] light work of any type.

3) Hand paresthesias. This was initially thought to be coming from his neck, but that is not the case[.] Dr. Wolf[f] noted positive Phalen's tests to all fingers, although negative Tinel's tests had been previously noted. I see no electrodiagnostic testing of his hands to confirm or refute this diagnosis. In addition, he had been diagnosed with a demyelinating peripheral neuropathy based on EMG/NCS of his lower extremities. This was not further clarified in the medical records....I was unaware of concerns about Carpal Tunnel syndrome. I did no[ ] specific provocative tests to assess this condition. I find it interesting, however, that [plaintiff] is only able to write for three minutes before his hands go numb, while being able to use the mouse to browse the web for 20 minutes at a time without difficulty. If further clarification regarding this condition is necessary, EMG/NCS of his upper extremities would be in order.

4) Demyelinating peripheral neuropathy. This was diagnosed based on a study performed 12/6/04. No comments are noted by treating providers as to the nature of this condition, or its relationship to described symptoms or level of function, although Dr. Wolf[f] did note the diagnosis in his progress note of 9/27/05.

5) History of Depression. This was diagnosed formally during a Disability Evaluation for the State of Illinois on 10/20/03. This diagnosis had also been entertained by Dr[.] Goldberg.... His mental status seems appropriate to his perceived physical condition during this examination. He is currently not being treated for this condition. The presence of depression certainly raises concerns about behavioral/emotional overlay regarding his back symptoms, and the possibility of a somatiform disorder.

6) Obesity. This condition in and of itself is not directly contributing to incapacity, impairment or disability. However, if his back pain is primarily facetogenic, myofascial, or mechanical in origin, his weight will contribute substantially to pain and perceived incapacity.[101]

Dr. Vasquez opined that plaintiff had the following functional limitations:

- No lifting over 20 pounds; may lift 10 to 20 pounds occasionally (up to 2% to 33% of the time); may lift up to 10 pounds frequently (34–66% of the time); may lift up to five po[u]nds continuously.

- May push or pull with up to 20 pounds of force occasionally.

- No repetitive bending or twisting; may bend rarely (up to 1% of the time).

- No repetitive stair climbing; may climb stairs rarely (up to 1% of the time).

- May walk up to 20 minutes at a time, with the ability to sit and rest for five to ten minutes before proceeding.

- May stand up to 30 minutes at a time, with allowances to shift weight, and with the ability to sit and rest for five to ten minutes before proceeding.

101. SEALED Admin. Rec. at DE-BENclm00708–09, Docket No. 31.

- May sit up to 45 minutes at a time, with allowances for change in position, and with the ability to stand and walk for ten minutes before sitting again.
- May reach and lift overhead, forward, and to the side without limitation.[102]

Based on his examination, Dr. Vasquez concluded that plaintiff could work.[103]

■ Given the independent nature of the Dr. Vasquez' report and the thoroughness of his examination, defendant's reliance on Dr. Vasquez' conclusion that plaintiff was "capable of sustaining full-time work in a sedentary, or light duty occupation"[104] was reasonable. Plaintiff, however, insists that defendant's reliance on Dr. Vasquez' IME prevented him from obtaining a full and fair review, which is a violation of ERISA regulations and a sign of bias.

> An administrator must provide a plan participant with adequate notice of the reasons for denial, and must provide a "full and fair review" of the participant's claim.... Accordingly, an administrator that adds, in its final decision, a new reason for denial, a maneuver that has the effect of insulating the rationale from review, contravenes the purpose of ERISA. This procedural violation must be weighed by the district court in deciding whether [the administrator] abused its discretion.

*Abatie,* 458 F.3d at 974 (internal citations omitted).

Dr. Vasquez performed the IME on October 24, 2006 and wrote his report on November 28, 2006. Defendant's final denial letter was issued on December 7, 2006.

On that same day, defendant provided a copy of the IME report to plaintiff.[105] Because he never saw a copy of the IME prior to defendant making its final benefits decision, plaintiff argues that defendant prevented him from obtaining a full and fair review. Plaintiff's primary complaint is that Dr. Vasquez addressed psychological issues and he did not have an opportunity to respond to Dr. Vasquez' findings as to these issues.

As an initial matter, an administrator's disclosure of evidence during litigation rather than during the administrative appeal provides the ERISA plaintiff with "ample opportunity to respond." *Silver v. Executive Car Leasing Long–Term Disability Plan,* 466 F.3d 727, 732 n. 2 (9th Cir.2006). Thus, plaintiff's complaint that he did not have an opportunity to respond to the IME is not well taken. More importantly, it was plaintiff himself who injected the issue of psychological issues into the administrative appeal process. In his appeal of defendant's initial decision to deny benefits, plaintiff accused defendant of ignoring his psychological impairment.[106] Plaintiff acknowledged that the benefit plan has a two-year limitation for benefits for mental impairments, but he argued that the fact that defendant ignored his mental impairment showed that defendant had a tendency to overlook evidence that might establish a claim.[107] Having injected the issue of his psychological impairment into the appeal, it was entirely reasonable for defendant to ask Dr. Vasquez to consider any such impairment, even if

102. SEALED Admin. Rec. at DE-BENclm00710, Docket No. 31.

103. SEALED Admin. Rec. at DE-BENclm00711, Docket No. 31.

104. SEALED Admin. Rec. at DE-BENclm00733, Docket No. 31.

105. SEALED Admin. Rec. at DE-BENclm00719, Docket No. 31.

106. SEALED Admin. Rec. at DE-BENclm01200–1201, Docket No. 32.

107. SEALED Admin. Rec. at DE-BENclm01201, Docket No. 32.

defendant did not base its benefits decision plaintiff's psychological impairment.

Based on the foregoing, the court concludes that defendant's benefits decision should be viewed with a modest amount of skepticism because there is some evidence of bias. Defendant did not consider the SSA disability determination and Wilkins' advocacy led to a disability opinion from Dr. Wolff that was biased and suspect. But, there is also evidence that defendant's decision was not influenced by financial considerations. Defendant sought an IME prior to denying benefits, and when plaintiff resisted submitting to the IME because his benefits had been terminated, defendant reinstated his benefits pending the results of the IME.

■ Viewing the benefits decision with a modest amount of skepticism, the court concludes that it was not an abuse of discretion for defendant to deny benefits. The IME, which was thorough and unbiased, provides a reasonable basis for denying benefits. The only other contemporaneous medical opinion is that provided by Dr. Ginsburg, which plaintiff obtained on his own after he knew that he was going to have to submit to an IME but before the IME was accomplished. Given that plaintiff knew that defendant was contemplating terminating his benefits, plaintiff's presentation to Dr. Ginsburg is itself suspect. The court is required to be suspicious of an administrator when it appears more concerned about financial considerations than its contractual obligations. The court is also entitled to be suspicious of a plaintiff who is seen hopping in and out of a pickup truck and lifting good sized boxes and who then presents himself to a doctor as being totally disabled from performing even sedentary work. The court is mindful that plaintiff had a lumbar myelogram on September 29, 2006, after his visit to Dr. Ginsburg. As Dr. Vasquez noted, the "CT myelogram revealed moderate central spinal canal stenosis at L2–3 and moderate to severe central spinal canal stenosis of L3–4 due to broad-based disc bulge and hypertrophy of the ligamentum flavum and facets." [108] In other words, Dr. Vasquez was aware of the objective findings that supported plaintiff's complaints of back pain but still concluded that plaintiff was capable of working.

Finally, the court considers defendant's cross-motion for summary judgment on its counterclaim seeking recovery of the overpayment of benefits to plaintiff. Defendant did not identify which of its four counterclaims it was seeking summary judgment on, but because ERISA preempts any state law claims, the only counterclaim that is valid is defendant's first counterclaim, which is a claim for equitable relief under 29 U.S.C. § 1132(a)(3).

29 U.S.C. § 1132(a) is the civil enforcement provision of ERISA, which provides, in pertinent part:

[a] civil action may be brought ... by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan[.]

The Supreme Court has "construed th[is] provision to authorize only 'those categories of relief that were *typically* available in equity,' and thus rejected a claim that ... sought 'nothing other than compensatory *damages*.'" *Sereboff v. Mid Atlantic Medical Srvcs., Inc.,* 547 U.S. 356, 361, 126 S.Ct. 1869, 164 L.Ed.2d 612 (2006) (quoting *Mertens v. Hewitt Assocs.,* 508 U.S.

---

**108.** SEALED Admin. Rec. at DE-BENclm00706, Docket No. 31.

248, 256, 255, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993)).

Plaintiff concedes that defendant's counterclaim could be viewed as one for restitution, which can be considered equitable relief in some situations. In *Great–West Life & Annuity Insurance Company v. Knudson*, 534 U.S. 204, 213, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002), the Court observed that "a plaintiff could seek restitution in equity, ordinarily in the form of a constructive trust or an equitable lien, where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession." However, plaintiff contends that defendant has disavowed that it is seeking a constructive trust and thus its counterclaim fails as a matter of law.

Plaintiff has misread defendant's comment in a footnote in its brief.[109] What defendant stated was that it was not seeking to impose a constructive trust or lien on any *future* SSA benefits plaintiff might receive. Defendant did not state that it was not seeking to impose an equitable lien or a constructive trust on the LTD benefits that it has overpaid plaintiff.

Plaintiff next argues that defendant's counterclaim must fail because defendant is not seeking equitable relief. "[F]or restitution to lie in equity, the action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession." *Id.* at 214, 122 S.Ct. 708. Because he no longer has the money that defendant is seeking, plaintiff argues that defendant is seeking to impose personal liability on him.

The fact that plaintiff commingled the LTD benefits he was overpaid with his other assets does not defeat defendant's counterclaim. *See Gutta v. Standard Se-*

*lect Trust Ins. Plans,* 530 F.3d 614, 621 (7th Cir.2008) (allowing a claim under "29 U.S.C. § 1132(a)(3) even if the benefits ... paid [the beneficiary] are not specifically traceable to [the beneficiary's] current assets because of commingling or dissipation"); *see also, Longaberger Co. v. Kolt,* 586 F.3d 459, 469 (6th Cir.2009). After *Sereboff,* three circuits have held that a plan fiduciary is entitled to recover the overpayment of LTD benefits based on the beneficiary's receipt of SSA benefits. *See Hall v. Liberty Life Assur. Co. Of Boston,* 595 F.3d 270, 274–75 (6th Cir.2010) (holding that plan was entitled to reimbursement of retroactive SSA benefits, but could not put lien on future benefits); *Cusson v. Liberty Life Assur. Co. of Boston,* 592 F.3d 215, 230–31 (1st Cir.2010) (holding that Liberty's counterclaim for reimbursement was an equitable claim because "the contract between Cusson and Liberty put Cusson on notice that she would be required to reimburse Liberty for an amount equal to what she might get from Social Security"); *Dillard's Inc. v. Liberty Life Assur. Co. of Boston,* 456 F.3d 894, 901 (8th Cir.2006) (holding that Liberty was entitled to "reimbursement for overpayments resulting from the receipt of social security benefits"). The court is persuaded by this authority and holds that the relief defendant seeks here is equitable relief for purposes of section 1132(a)(3).

But even if the relief that defendant is seeking is equitable relief, which it is, plaintiff argues that defendant's counterclaim still fails because social security benefits are statutorily exempt from attachment. Section 407(a) of title 42 of the United States Code provides:

The right of any person to any future payment under this subchapter shall not be transferable or assignable, at law or in equity, and none of the moneys paid

109. *See* Cross–Motion for Summary Judgment on Counterclaim at 30, n. 45, Docket No. 44.

or payable or rights existing under this subchapter shall be subject to execution, levy, attachment, garnishment, or other legal process, or to the operation of any bankruptcy or insolvency law.

Plaintiff cites to *Ross v. Pennsylvania Manufacturers Association Insurance Company*, Case No. Civ.A. 1:05–0561ot, 2006 WL 1390446 (S.D.W.Va. May 22, 2006), to support his argument. There, "PMA [sought] the imposition of a constructive trust on future SSDI payments to plaintiff to the extent necessary to extinguish" an overpayment of benefits. *Id.* at *7. The court held that "[w]hile it is clear that a pension plan such as PMA is permitted to reduce payments to persons by a percentage of the amount of Social Security benefits received by them, this section (a) of this statute explicitly prohibits the equitable action PMA now seeks." *Id.* at *8.

*Ross* has no application here. Defendant is not seeking a lien on plaintiff's future SSA benefits. Rather, defendant seeks an equitable lien on the amount of LTD benefits that it overpaid plaintiff. "[W]hen a plan contains a 'lien by agreement' and the 'overpayment' is caused by subsequent social security payments, Section 407 presents no bar to recovery." *Holmstrom v. Metropolitan Life Ins. Co.*, 615 F.Supp.2d 722, 753 (N.D.Ill.2009).

Defendant's motion for summary judgment on its counterclaim is granted. Defendant is entitled to recover the amount of LTD benefits it overpaid plaintiff due to plaintiff's receipt of SSA benefits.

### Conclusion

Plaintiff's motion for summary judgment [110] is denied, and defendant's cross-motion [111] is granted. Defendant's benefits decision is affirmed. The clerk of court shall dismiss plaintiff's complaint with prejudice and enter judgment for defendant in the amount of $18,011.04.

---

110. Docket No. 37.

111. Docket No. 44.